## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LING HAN, | : | **Civil Action No:** |
|     *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
|     *Defendant.* | : | |

## <u>COMPLAINT</u>

1.      In March 2022, a Yale faculty member recruited Plaintiff Ling Han away from a confirmed Ph.D. position at Duke University with promises of admission, funding, and advising at Yale. Plaintiff withdrew from Duke—an irreversible decision—and enrolled. Within months, that faculty member abandoned the advising relationship. Over the next two years, Plaintiff attempted to secure a new advisor, as every doctoral student must. Faculty members expressed willingness to work with him. Each time, Yale intervened—imposing new funding requirements, communicating inaccurate information about Plaintiff's academic record, and applying handbook provisions that were not in effect when Plaintiff enrolled. When Plaintiff was diagnosed with and sought accommodations for his disability, the department failed to engage in the interactive process. When Plaintiff filed complaints of discrimination, the obstacles multiplied. The official responsible for approving his advisor was simultaneously the subject of his complaint, and Yale implemented no safeguards against the conflict. The net result is that a student who completed all required coursework, published extensively, and held three patents was maneuvered to the brink of withdrawal—not for academic failure, but through institutional decisions that deprived him of the single thing every Ph.D. student needs to continue: a willing advisor whom the department will approve. This action seeks to hold Yale accountable for its violation of the Plaintiff's rights under federal disability rights law.

**PARTIES**

2.      Ling Han  is a citizen of the People's Republic of China. At all times relevant to this Complaint, Plaintiff was enrolled as a Ph.D. student in the Department of Computer Science at Yale University in New Haven, Connecticut. Plaintiff holds a bachelor's and a master's degree in Computer Science and Technology from Wuhan University. He is the named inventor on three authorized blockchain patents and has published eight peer-reviewed research papers in top-tier conferences and journals in the fields of artificial intelligence, machine learning, and distributed systems, including publications in the Annual AAAI Conference on Artificial Intelligence, IEEE Transactions on Information Forensics and Security, and the IEEE International Conference on Data Engineering.

3.      Yale University is a private research university incorporated under Connecticut law and headquartered in New Haven, Connecticut. Yale receives federal financial assistance and is therefore subject to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Yale operates places of public accommodation within the meaning of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq. At all times relevant to this Complaint, the individual Yale officials, faculty members, and administrators whose conduct is described herein— including Professor Fan Zhang, Professor Lin Zhong (Director of Graduate Studies, Department of Computer Science), Professor Holly Rushmeier (Chair of the Department of Computer Science and acting Director of Graduate Studies from April 2024), and Dean Allegra di Bonaventura (Associate Dean for Academic Support, Yale Graduate School of Arts and Sciences)—were acting within the course and scope of their employment, authority, and agency on behalf of Yale University. Yale is responsible for their acts and omissions under the doctrines of respondeat superior and agency.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 (federal question jurisdiction). This action arises under the Americans with Disabilities

Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §

794, and their anti-retaliation provisions.

5.     This Court has supplemental jurisdiction over the state-law claims asserted

herein pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims within

the Court's original jurisdiction that they form part of the same case or controversy under

Article III of the United States Constitution. The state-law claims arise from the same nucleus

of operative facts as the federal claims.

6.     Venue is proper in this judicial district because Yale University is headquartered

in and maintains its principal place of business in New Haven, Connecticut, within the District

of Connecticut. All of Yale's relevant officers, faculty, and administrators reside and work in

Connecticut. A substantial part of the events or omissions giving rise to the claims occurred at

Yale University in New Haven, Connecticut, including all alleged acts of discrimination,

retaliation, breach of contract, and infliction of emotional distress.

## FACTUAL ALLEGATIONS

**A.     Plaintiff's Academic Background and Recruitment to Yale**

7.     Plaintiff is a highly qualified researcher in computer science with particular

expertise in blockchain technology, machine learning, and artificial intelligence. His research

contributions have been recognized through peer-reviewed publications in leading venues and

through patents in the blockchain field.

8.      On January 12, 2022, Plaintiff received an official offer of admission from Duke University's Ph.D. program in Computer Science. During and prior to the admissions cycle, Plaintiff had been in communication with Professor Fan Zhang, then an Assistant Professor at Duke University, and Professor Kartik Nayak of Duke, both of whom encouraged Plaintiff to accept Duke's offer.

9.      On March 15, 2022, Plaintiff formally accepted Duke University's Ph.D. offer of admission in Duke's enrollment system.

10.     On March 30, 2022, Professor Zhang informed Plaintiff that he would be relocating from Duke to Yale because his spouse had received an appointment at the Yale School of Management. Professor Zhang urged Plaintiff to withdraw from Duke and follow him to Yale. Professor Zhang repeatedly assured Plaintiff that if he submitted his application to Yale, he would be admitted to the Computer Science Ph.D. program and would receive appropriate funding and academic support.

11.     Acting on these assurances, Plaintiff applied to Yale on April 8, 2022. On May 24, 2022, Yale issued Plaintiff a formal offer of admission. Plaintiff promptly accepted the offer.

12.     On June 8, 2022, Plaintiff formally withdrew from Duke University, copying Professor Zhang on the withdrawal communication. Plaintiff began receiving his Yale stipend effective August 1, 2022. Associate Dean Allegra di Bonaventura of the Yale Graduate School of Arts and Sciences ("GSAS") approved an early project start date of June 1, 2022, reflecting Plaintiff's early enrollment.

13.     At the time of his acceptance, the governing academic policies for the Computer Science Ph.D. program were set forth in the 2021 edition of the CS Ph.D. Handbook (the "2021

Handbook"), which Plaintiff reviewed before confirming his enrollment. The 2021 Handbook expressly permitted doctoral students to have advisors outside the Department of Computer Science. The 2022 edition of the Handbook, which imposed different and more restrictive requirements regarding external advisors, was not published until August 19, 2022—after Plaintiff had already accepted his admission, withdrawn from Duke, and begun receiving his Yale stipend.

**B.    Initial Advising Relationship and Termination by Professor Zhang**

14.    Plaintiff commenced doctoral coursework on August 23, 2022. Professor Zhang served as Plaintiff's initial faculty advisor, consistent with the commitment that had induced Plaintiff's enrollment.

15.    Between September and November 2022, academic disagreements arose between Plaintiff and Professor Zhang. Plaintiff wished to pursue research on distributed system architecture, including statistical analysis of Ethereum "uncle blocks," an area related to his prior patented work. Professor Zhang dismissed this direction and insisted that Plaintiff limit his work to trading-related research. Professor Zhang also imposed a subjective, non-standard publication requirement, stating that graduation would depend solely on his personal satisfaction rather than any defined departmental standard.

16.    On or about December 8, 2022, Plaintiff met with Professor Zhang and requested a deadline extension. During the meeting, Plaintiff disclosed that he was experiencing significant anxiety and sadness—symptoms that were later diagnosed as manifestations of Borderline Personality Disorder. Professor Zhang compared Plaintiff unfavorably to a colleague who did not experience similar challenges. Professor Zhang subsequently sent Plaintiff an email

that mischaracterized Plaintiff's disclosure of emotional distress as an inability to comprehend research papers.

17.     On December 14, 2022, in an abrupt in-person meeting, Professor Zhang terminated his advising relationship with Plaintiff, stating that he "couldn't take it for another five years." He refused to recommend any alternative advisors and directed Plaintiff to find one independently. This termination left Plaintiff without an advisor in the middle of his first academic year.

**C.     Efforts to Secure New Advising and Hostile Treatment**

18.     In January 2023, Plaintiff began a new laboratory rotation under Professor Mark Gerstein, facilitated through an alumni network. The rotation involved working with postdoctoral researchers Gaoyuan Wang and Tianxiao Li. Although Plaintiff's work with Li proceeded successfully, Plaintiff encountered hostility from Wang during a course-related collaboration.

19.     A dispute arose when Wang reversed her prior written permission for Plaintiff to use a base model for a course project and demanded supervisory control over the project in violation of Yale's academic integrity standards. Wang subsequently threatened Plaintiff and publicly disparaged him. This written authorization was documented in email communications.

20.     When Plaintiff gave his required laboratory rotation presentation, neither of his rotation mentors attended—a departure from the customary practice in the laboratory.

21.     On April 18, 2023, Plaintiff began a rotation in Professor Rex Ying's laboratory. On June 30, 2023, Professor Ying agreed to co-advise Plaintiff alongside Professor Gerstein. Despite this agreement, coordination between the two advisors stalled, and no joint meetings

materialized. Professor Gerstein failed to engage in the discussions necessary to formalize the arrangement.

**D.      Revocation of Teaching Fellow Appointment and Hostile Conduct**

22.      On August 25, 2023, without prior notice, hearing, or written explanation, the department registrar, Ragini Jain, sent Plaintiff an email with the subject "Unassignment of Teaching," summarily revoking Plaintiff's approved Teaching Fellow appointment for the upcoming semester. This revocation deprived Plaintiff of both financial resources and a core requirement of the doctoral program.

23.      Plaintiff contacted Professor Lin Zhong, the Director of Graduate Studies ("DGS"), to understand the basis for the revocation. In their first conversation, Zhong stated he was unaware of the situation. In a second conversation, which Plaintiff recorded, Zhong unilaterally accused Plaintiff of "misconduct," alleging that Plaintiff had used a laboratory's intellectual property in a course without authorization. In fact, Plaintiff had obtained written authorization for such use, as documented in email communications. During this same recorded conversation, Zhong stated to Plaintiff, "maybe you are a psycho."

24.      Following Plaintiff's contact with Dean Allegra di Bonaventura of GSAS on August 29, 2023, Dean di Bonaventura intervened by contacting Zhong and informing him that GSAS does not permit the immediate withdrawal of students without procedural protections and that GSAS would provide one semester of emergency funding while Plaintiff sought a new advisor.

25.      Beginning in September 2023, as a direct result of the hostile treatment, loss of funding, and academic instability he experienced, Plaintiff began seeking psychological treatment. He was diagnosed with Borderline Personality Disorder ("BPD"), a recognized

disability under the ADA and Section 504. Plaintiff's treating clinician documented that this condition substantially limits major life activities including interpersonal relationships, emotional regulation, concentration, and stress tolerance.

### E.    Systematic Obstruction of Advisor Arrangements

26.    Following his diagnosis, Zhong directed Plaintiff to contact Professors Ying and Gerstein regarding the misconduct allegations. Professor Gerstein responded by email stating: "Rex and I have conferred extensively about your situation. We have also talked directly to the CS DGS about it. Bottom line: it is not going to work out with Rex & me, and I think you should consult the DGS soon about the next steps."

27.    On September 27, 2023, Plaintiff met with Zhong to discuss advising options. During that meeting, Zhong explicitly informed Plaintiff that he could seek an advisor outside the Computer Science Department, provided that the advisor could offer financial support. Zhong stated: "The only additional requirement for an advisor outside CS is that there must be a primary faculty member acting as the 'sponsor.' This sponsor will share the financial obligation with the outside advisor."

28.    On the same day, Plaintiff met with newly appointed Assistant Professor Tesca Fitzgerald, who indicated she had a collaboration with Professor Alex Wong in the Computer Science Department and would explore whether Wong could serve as Plaintiff's advisor.

29.    On October 12, 2023, Professor Fitzgerald informed Plaintiff that Professor Wong might not serve as a primary advisor but could potentially act as a co-advisor. That same day, Plaintiff contacted Professor Andrew (Richard) Taylor of the Department of Biomedical Informatics and Data Science, who expressed interest in serving as Plaintiff's advisor. Plaintiff

provided both names to the department registrar, requesting assistance in facilitating the arrangements. No such facilitation occurred.

30.     On October 26, 2023, Professor Fitzgerald informed Plaintiff that, after conferring with DGS Zhong, she could not serve as co-advisor. She explained that Zhong had communicated that a CS co-advisor would be required to assume a level of commitment equivalent to a full advisor, including full funding responsibility—a requirement not previously articulated and not reflected in the 2021 Handbook or in the standard departmental practices as they had been described to Plaintiff.

31.     This newly imposed funding mandate was applied selectively to Plaintiff's case. Upon information and belief, other doctoral students in the department had been provided departmental funding support while seeking advisors, and co-advisory arrangements had not previously required this level of financial commitment from CS-affiliated co-advisors.

32.     Prior to December 5, 2023, Plaintiff had secured a commitment from Professor James Aspnes, a senior professor in the Computer Science Department, to serve as Plaintiff's advisor of record—a role that would allow Plaintiff to work with a faculty advisor outside the department, consistent with the arrangement DGS Zhong had previously authorized. On or about December 5, 2023, however, Department Chair Rushmeier sent Professor Aspnes an email misrepresenting Plaintiff's academic record and imposing new funding obligations. Rushmeier wrote that Plaintiff "only finished 3" required courses and stated that "[e]ven taking 3 courses next term (as he has currently registered) he will not be in good standing." In fact, Plaintiff had satisfied all doctoral coursework requirements at the time. Rushmeier further told Professor Aspnes that he would need to "take on looking for funding" for Plaintiff, and urged him to "use department funds for students who are meeting their milestones." Professor Aspnes

withdrew his commitment the same day, writing that the situation was "even worse than I was led to believe."

33.    On December 5, 2023, Plaintiff requested an additional semester of emergency funding from GSAS. On December 6, 2023, Dean di Bonaventura denied the request, stating that no further extensions were available, and informed Plaintiff that if he could not "transfer departments or find an advisor approved by the Computer Science department by 1/14/24," he would be "administratively withdrawn."

### F.    Conduct of the Department Chair and Acting DGS

34.    Beginning in approximately April 2024, Professor Holly Rushmeier, who served as Chair of the Computer Science Department, assumed the additional role of acting DGS. In this dual capacity, Rushmeier exercised authority over Plaintiff's advisor confirmation process, funding eligibility, and academic standing on behalf of Yale.

35.    In or around May–June 2024, Plaintiff identified Professor María Rodríguez Martínez, a faculty member affiliated with Yale's Department of Biomedical Informatics and Data Science, as a potential advisor. Professor Rodríguez Martínez initially agreed to explore serving as Plaintiff's advisor and met with Rushmeier on June 7, 2024, to discuss the requirements for serving as an advisor of record and establishing an association with the CS department.

36.    On June 12, 2024, Professor Steven Zucker, David and Lucile Packard Professor of Biomedical Engineering and Computer Science, communicated that he could serve as Plaintiff's advisor of record. On June 14, 2024, Professor Rodríguez Martínez wrote to Rushmeier to inform her that she had "stepped down from supervising" Plaintiff.

37.     Upon information and belief, Rushmeier's communications with Professor Rodríguez Martínez included disclosures that staff members had reported concerns about interactions with Plaintiff and that other faculty who had worked with Plaintiff were "uncomfortable" with taking him on, though she did not share details or underlying circumstances. Professor Rodríguez Martínez subsequently cited "the whole package" as the reason for declining. While multiple factors may have contributed to Professor Rodríguez Martínez's decision, the nature and timing of Rushmeier's disclosures were calculated to present Plaintiff in a negative light and discourage potential advisors.

38.     During the OIEA investigation, it was established that Rushmeier had communicated inaccurate information about Plaintiff's academic record to prospective advisors. In her email to Professor Aspnes, Rushmeier wrote that Plaintiff "only finished 3" required courses in his first year and that "[e]ven taking 3 courses next term (as he has currently registered) he will not be in good standing." These representations were false. Plaintiff had in fact satisfied all doctoral coursework requirements at the time. The OIEA investigation confirmed the inaccuracy of Rushmeier's course-count representation.

39.     In December 2024, Plaintiff identified Professor Xiaofeng Liu, an Assistant Professor of Radiology and Biomedical Imaging and of Biomedical Informatics and Data Science at Yale, as a prospective advisor. Professor Liu agreed to serve as Plaintiff's advisor. Plaintiff, through Dean di Bonaventura, communicated this proposal to Rushmeier for departmental approval.

40.     Rushmeier denied the request to confirm Professor Liu as Plaintiff's advisor on the basis that Liu did not hold a primary or secondary appointment in the Computer Science Department. However, upon information and belief, other students in the program—including

students in Plaintiff's cohort—had advisors whose primary appointment was outside the Computer Science Department. DGS Zhong had previously told Plaintiff that an external advisor was permitted with a CS faculty "sponsor." The application of this requirement to Plaintiff's case, after prior representations that external advisors were permissible, was inconsistent and selectively applied.

41.    During the advisor confirmation process in December 2024, Plaintiff raised documented concerns about the risk of retaliation, citing Yale's own Policy Against Discrimination and Harassment, which defines retaliation as "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy," including "conduct that would discourage a reasonable person from engaging in activity protected under this policy." Plaintiff had filed complaints with OIEA and the U.S. Department of Education's Office for Civil Rights (OCR Case No. 01-25-2038). Plaintiff specifically requested that Rushmeier and Zhong, both subjects of pending complaints, not be permitted to exercise unilateral control over the advisor confirmation process. Yale declined to implement any protective measures.

### G.    Yale's Failure to Accommodate Plaintiff's Disability

42.    In September 2023, Plaintiff was diagnosed with Borderline Personality Disorder, a mental health condition that substantially limits major life activities including concentration, interpersonal functioning, emotional regulation, and the ability to manage stress. Plaintiff's physician documented these functional limitations and their relationship to Plaintiff's academic environment.

43.    Yale received formal notice of Plaintiff's disability through multiple channels, including communications with GSAS, OIEA, and Student Accessibility Services ("SAS").

Plaintiff requested reasonable accommodations to enable him to continue in the program, including stable advising, procedural protections during the advisor-search process, and temporary funding to prevent the loss of his enrollment status while accommodations were being arranged.

44.     Despite receiving notice of Plaintiff's disability, Yale failed to engage in the interactive process required under federal disability law. Yale did not convene a meeting with Plaintiff and SAS to determine appropriate academic adjustments. Yale did not assess Plaintiff's requests on a case-by-case basis as required by its own SAS Policies and Procedures. Instead, Yale's Department of Computer Science, through its DGS and Department Chair, continued to impose the same requirements that had systematically prevented Plaintiff from securing an advisor—requirements that, upon information and belief, were applied more flexibly to other students who did not have disabilities.

45.     OIEA's investigation acknowledged that "students with disabilities have a right to receive reasonable modifications that are necessary to afford them with an equal opportunity to participate in an academic or co-curricular activity at Yale unless it poses an undue hardship or would result in a fundamental alteration of the program." However, OIEA's assessment of Plaintiff's complaint regarding Professor Zhang concluded that the information did "not suggest that Prof. Zhang was aware of your disability during any of your interactions in 2022," because Plaintiff had not yet received his formal diagnosis. This assessment did not address whether Yale had an obligation to accommodate Plaintiff once the disability was diagnosed in 2023, nor whether the subsequent conduct by Yale officials constituted discrimination or failure to accommodate based on the known disability.

46.     The OIEA investigation report regarding Rushmeier, issued in connection with Case No. 2023153806, acknowledged that Plaintiff had disclosed his disability and had engaged with SAS, yet concluded that Rushmeier's actions were consistent with departmental policy without adequately addressing the selective and disparate application of those policies to Plaintiff as compared to non-disabled students.

**H.     Pattern of Retaliation Following Protected Activity**

47.     Plaintiff engaged in protected activity on multiple occasions, including by filing complaints with Yale's OIEA, communicating concerns about discrimination to GSAS and departmental officials, contacting the U.S. Department of Education's Office for Civil Rights (OCR Case No. 01-25-2038), and requesting disability accommodations through SAS and GSAS.

48.     Following these protected activities, Yale took a series of materially adverse actions against Plaintiff, including but not limited to: the summary revocation of his Teaching Fellow appointment in August 2023 without notice or hearing; the imposition of new and heightened requirements for advisor arrangements that were not applied to similarly situated students; the dissemination of inaccurate and prejudicial information about Plaintiff's academic record and interpersonal conduct to prospective advisors; the denial of additional emergency funding; and the threatened administrative withdrawal of Plaintiff from the program.

49.     The temporal proximity between Plaintiff's protected activities and the adverse actions, combined with the shifting and selectively applied justifications offered by Yale, supports a reasonable inference that the adverse actions were motivated, at least in part, by retaliatory animus.

**I.     Severe Emotional and Academic Harm**

50.     As a direct and proximate result of Yale's conduct, Plaintiff has suffered severe emotional distress, including anxiety, depression, and exacerbation of his Borderline Personality Disorder. Plaintiff has required ongoing psychological treatment. Plaintiff has suffered the loss of his Ph.D. academic opportunity, loss of income and financial support, reputational harm within his academic field, and the destruction of his career trajectory. Plaintiff forfeited a confirmed Ph.D. position and funding at Duke University in reliance on promises by Yale's agent, Professor Zhang, and has been unable to recover that opportunity.

**CAUSES OF ACTION**

**COUNT ONE: DISABILITY DISCRIMINATION UNDER THE ADA**

51.     Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

52.     Yale University operates places of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12182, including its educational programs and facilities.

53.     Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff has been diagnosed with Borderline Personality Disorder, a mental health impairment that substantially limits one or more major life activities, including concentration, emotional regulation, interpersonal functioning, and the ability to manage academic stress.

54.     Yale discriminated against Plaintiff on the basis of his disability by, among other things: (a) failing to engage in the interactive process to determine reasonable accommodations after receiving notice of Plaintiff's disability; (b) denying Plaintiff reasonable accommodations, including stable advising arrangements and procedural protections, that were necessary to afford him an equal opportunity to participate in the doctoral program; (c) permitting its officials to stigmatize Plaintiff's mental health condition, including the DGS's

statement that Plaintiff was "a psycho"; (d) applying departmental policies regarding advisor eligibility and funding requirements in a more restrictive manner to Plaintiff than to similarly situated non-disabled students; and (e) subjecting Plaintiff to adverse treatment after disclosure of his disability, including the dissemination of inaccurate and prejudicial information to prospective advisors.

55.     Yale's discriminatory conduct was intentional or, at minimum, the result of deliberate indifference to Plaintiff's rights under the ADA.

56.     As a direct and proximate result of Yale's disability discrimination, Plaintiff has suffered damages including, but not limited to, loss of educational opportunity, loss of financial support, emotional distress, reputational harm, and other consequential damages.

**COUNT TWO: DISABILITY DISCRIMINATION UNDER SECTION 504**

57.     Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

58.     Yale University is a recipient of federal financial assistance and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, including 34 C.F.R. Part 104.

59.     Plaintiff is an "otherwise qualified individual" with a "handicap" within the meaning of Section 504 and its implementing regulations. Plaintiff was academically qualified to participate in and benefit from Yale's Computer Science Ph.D. program, having completed all required doctoral coursework and maintained good academic standing.

60.     Yale excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination under its educational program solely by reason of his disability. Specifically, Yale failed to provide reasonable academic adjustments as required by

34 C.F.R. § 104.44, including but not limited to accommodations in the advisor-selection process, temporary funding support to prevent loss of enrollment during the accommodation process, and protection from the influence of officials who had demonstrated hostility toward Plaintiff's disability-related needs.

61.     Yale's failure to accommodate Plaintiff was not justified by undue hardship or fundamental alteration. Other students who lacked advisors for reasons beyond their control received departmental funding and flexibility in advisor requirements. Yale's refusal to extend comparable support to Plaintiff, a student with a documented disability, constituted disparate treatment.

62.     Yale's conduct was intentional or the result of deliberate indifference to Plaintiff's federally protected rights.

63.     As a direct and proximate result of Yale's violations of Section 504, Plaintiff has suffered damages including loss of educational opportunity, loss of financial support, emotional distress, reputational harm, and other consequential damages.

**COUNT THREE: RETALIATION UNDER THE ADA**

64.     Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

65.     Plaintiff engaged in protected activity under the ADA, including but not limited to: (a) requesting reasonable accommodations for his disability from Yale officials, GSAS, and SAS; (b) filing complaints of disability discrimination with Yale's OIEA; (c) filing a complaint with the U.S. Department of Education's Office for Civil Rights (OCR Case No. 01-25-2038); and (d) communicating concerns about discriminatory and hostile treatment to GSAS, departmental officials, and the Yale graduate student union.

66.     Following Plaintiff's protected activities, Yale, through its officers, agents, and employees, took materially adverse actions against Plaintiff, including: (a) the summary revocation of Plaintiff's Teaching Fellow appointment without notice or hearing; (b) the imposition of new and selectively applied requirements that prevented Plaintiff from securing an advisor; (c) the dissemination of inaccurate and damaging information about Plaintiff's academic record and conduct to prospective faculty advisors, causing them to withdraw their willingness to advise Plaintiff; (d) the denial of emergency funding extensions that had been provided in comparable circumstances; (e) the denial of Plaintiff's proposed advisor (Professor Liu) on grounds that were inconsistently applied; and (f) the threat of administrative withdrawal from the program.

67.     There is a causal connection between Plaintiff's protected activities and the adverse actions. The adverse actions occurred in close temporal proximity to Plaintiff's complaints and requests for accommodation. The pattern of escalating obstacles imposed on Plaintiff's advisor search intensified after his OIEA and OCR filings. Yale's shifting justifications for its actions further support a reasonable inference of retaliatory motive.

68.     As a direct and proximate result of Yale's retaliation, Plaintiff has suffered damages including loss of educational opportunity, loss of financial support, emotional distress, reputational harm, and other consequential damages.

**COUNT FOUR: RETALIATION UNDER SECTION 504**

69.     Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

70.     Plaintiff engaged in protected activity under the ADA, including but not limited to: (a) requesting reasonable accommodations for his disability from Yale officials, GSAS, and

18

SAS; (b) filing complaints of disability discrimination with Yale's OIEA; (c) filing a complaint with the U.S. Department of Education's Office for Civil Rights (OCR Case No. 01-25-2038); and (d) communicating concerns about discriminatory and hostile treatment to GSAS, departmental officials, and the Yale graduate student union.

71.     Following Plaintiff's protected activities, Yale, through its officers, agents, and employees, took materially adverse actions against Plaintiff, including: (a) the summary revocation of Plaintiff's Teaching Fellow appointment without notice or hearing; (b) the imposition of new and selectively applied requirements that prevented Plaintiff from securing an advisor; (c) the dissemination of inaccurate and damaging information about Plaintiff's academic record and conduct to prospective faculty advisors, causing them to withdraw their willingness to advise Plaintiff; (d) the denial of emergency funding extensions that had been provided in comparable circumstances; (e) the denial of Plaintiff's proposed advisor (Professor Liu) on grounds that were inconsistently applied; and (f) the threat of administrative withdrawal from the program.

72.     There is a causal connection between Plaintiff's protected activities and the adverse actions. The adverse actions occurred in close temporal proximity to Plaintiff's complaints and requests for accommodation. The pattern of escalating obstacles imposed on Plaintiff's advisor search intensified after his OIEA and OCR filings. Yale's shifting justifications for its actions further support a reasonable inference of retaliatory motive.

73.     As a direct and proximate result of Yale's retaliation, Plaintiff has suffered damages including loss of educational opportunity, loss of financial support, emotional distress, reputational harm, and other consequential damages.

**COUNT FIVE: BREACH OF CONTRACT**

74.    Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

75.    An implied contractual relationship exists between a student and a private university based on the university's published policies, handbooks, catalogs, and official representations at the time of the student's enrollment. Such contracts may be enforceable when students reasonably rely on published academic policies and institutional representations.

76.    An implied contract was formed when Plaintiff accepted Yale's formal offer of admission in May 2022, withdrew from Duke University, and commenced enrollment in the Computer Science Ph.D. program with receipt of a university stipend beginning August 1, 2022. The terms of this implied contract included the academic policies, procedures, and commitments set forth in the 2021 CS Ph.D. Handbook, Yale's Graduate School policies, and Yale's Policy Against Discrimination and Harassment—all of which were in effect at the time of Plaintiff's enrollment.

77.    Yale materially breached this implied contract in the following respects:

a. Yale retroactively applied the 2022 edition of the CS Ph.D. Handbook— published on August 19, 2022, after Plaintiff's enrollment was confirmed—to deny Plaintiff the right to an external advisor, a right that was expressly available under the 2021 Handbook that governed at the time of his matriculation;

b. Yale summarily revoked Plaintiff's approved Teaching Fellow appointment on or about August 25, 2023, without providing prior notice, a hearing, a written explanation, or any of the procedural protections required under its own policies;

c. Yale obstructed Plaintiff's efforts to secure a new academic advisor by imposing shifting and arbitrary conditions—including requiring CS-affiliated co-advisors to assume full funding responsibility—that were not standard departmental requirements and were not uniformly applied to other students;

d. Yale disseminated inaccurate information about Plaintiff's academic record through its officials, including the Department Chair's false representations to a prospective advisor that Plaintiff "only finished 3" required courses and that "[e]ven taking 3 courses next term (as he has currently registered) he will not be in good standing," when in fact Plaintiff had satisfied all doctoral coursework requirements;

e. Yale denied Plaintiff's proposed advisor (Professor Liu) on the basis of a policy that had been waived or modified by prior DGS representations and that was not consistently applied to other students with advisors outside the Computer Science Department.

78.    Yale's breaches were not justified by legitimate academic or administrative reasons. Yale deviated from its own published policies and treated Plaintiff in a manner inconsistent with the treatment afforded to similarly situated students.

79.    As a direct and proximate result of Yale's breaches, Plaintiff suffered damages including loss of educational opportunity, loss of income and financial support, the forfeiture of his Duke University Ph.D. position, emotional distress, reputational harm, and other consequential damages.

**COUNT SIX: PROMISSORY ESTOPPEL**

80.    Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

81.     Professor Fan Zhang, acting as a faculty member of Yale University and within the scope of his authority, made clear and definite promises to Plaintiff in March and April 2022. Specifically, Professor Zhang promised that if Plaintiff withdrew from Duke University and applied to Yale, Plaintiff would be admitted to Yale's Computer Science Ph.D. program and would receive appropriate funding and academic support.

82.     Professor Zhang made these promises under circumstances in which he should reasonably have expected them to induce Plaintiff to take definite and substantial action. Professor Zhang knew that Plaintiff had already accepted a Ph.D. position at Duke with confirmed funding and that withdrawal from Duke would be irreversible.

83.     Plaintiff reasonably and foreseeably relied on these promises by withdrawing from Duke University on June 8, 2022, forfeiting his confirmed admission and funding, and enrolling at Yale.

84.     Plaintiff's reliance resulted in substantial and quantifiable detriment. After matriculation at Yale, Plaintiff was denied stable advisor support, was subjected to arbitrary academic decisions, lost his Teaching Fellow appointment, was obstructed in his efforts to find an advisor, and was threatened with administrative withdrawal—all of which deprived him of the academic opportunity and support he was promised and for which he sacrificed his position at Duke.

85.     Promissory estoppel may be invoked where a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

86.     Injustice can be avoided here only by enforcing Yale's promise to provide Plaintiff with the educational opportunity, funding, and support for which he abandoned a confirmed position elsewhere.

87.     As a direct and proximate result of Yale's failure to honor the promises made through its agent Professor Zhang, Plaintiff has suffered damages including loss of educational opportunity, loss of the Duke Ph.D. position and associated funding, financial hardship, emotional distress, and reputational harm.

**COUNT SEVEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

88.     Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

89.     Yale, through its officers, agents, and employees acting within the course and scope of their employment, engaged in extreme and outrageous conduct that exceeded all bounds tolerated by a decent society.

90.     Yale's extreme and outrageous conduct, carried out through its agents, includes but is not limited to:

a. The DGS's statement to Plaintiff, "maybe you are a psycho," which stigmatized Plaintiff's mental health and was made in the context of that official's exercise of institutional authority over Plaintiff's academic standing and funding;

b. The DGS's baseless accusation of academic "misconduct" against Plaintiff, without investigation and despite evidence that Plaintiff had obtained authorization for the conduct at issue;

c. The summary revocation of Plaintiff's Teaching Fellow appointment without notice, explanation, or due process, causing immediate financial harm and academic jeopardy;

d. The systematic obstruction of Plaintiff's efforts to secure an advisor through the imposition of shifting, pretextual requirements designed to ensure that no advisor arrangement could be finalized;

e. The Department Chair's dissemination of inaccurate and prejudicial information about Plaintiff's academic record and conduct to prospective advisors, undermining Plaintiff's ability to secure advising and thereby threatening his continued enrollment;

f. The deliberate isolation of Plaintiff within the academic community by signaling to faculty that advising Plaintiff would be burdensome and complicated, thereby stigmatizing him;

g. Yale's failure to implement any protective measures during the advisor-confirmation process despite Plaintiff's documented concerns about retaliation from officials who were subjects of his pending complaints.

91.     Yale knew or should have known that the conduct of its agents would cause Plaintiff severe emotional distress. Yale's agents occupied positions of institutional authority over Plaintiff, a vulnerable graduate student and foreign national whose immigration status, financial support, and career trajectory were dependent upon his continued enrollment.

92.     As a direct and proximate result of Yale's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including but not limited to anxiety, depression, and exacerbation of his diagnosed Borderline Personality Disorder, requiring ongoing psychological treatment. Plaintiff's emotional distress has been medically documented.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays for:

A. A declaratory judgment;

B. A permanent injunction requiring Yale University to:

(i) reinstate Plaintiff in good academic standing to the Computer Science Ph.D program with full accommodations; (ii) facilitate the assignment of a qualified advisor approved by Plaintiff and the Graduate School without interference by officials who are subjects of the Plaintiff's complaints; (iii) restore all teaching and funding appointments that were revoked or denied; and (iv) correct any inaccurate records regarding Plaintiff's academic standing, coursework completion, and conduct;

C. Compensatory damages;

D. Attorney's fees and costs; and

E. Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

PLAINTIFF
By:_____/s/_____
Alexander T. Taubes, Esq.
Federal Bar No.: ct30100
Alexander T. Taubes
470 James Street, Suite 007
New Haven, CT 06513
(203) 909-0048
alextt@gmail.com